**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BRIAN BLISCHAK,** | § | |
| **Individually and as assignee of** | § | |
| **NEXEON MEDSYSTEMS, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **WILLIAM ROSELLINI AND** | § | **JURY TRIAL** |
| **ROSELLINI SCIENTIFIC, LLC,  AND** | § | |
| **ROSELLINI SCIENTIFIC** | § | |
| **HOLDINGS, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

_____

**PLAINTIFF'S ORIGINAL COMPLAINT**
_____

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Brian Blischak, individually and as assignee of Nexeon MedSystems, Inc., files

this Complaint against Defendants William Rosellini, Rosellini Scientific, LLC, and Rosellini

Scientific Holdings, LLC, and for cause of action shows:

**I. PARTIES**

1.      Plaintiff Brian Blischak ("**Blischak**" or "**Plaintiff**") is a citizen of the State of

California.

2.      Defendant William Rosellini ("**Rosellini**") is an individual resident of Puerto Rico

who may be served with process by serving him at his residence located at B1 Paseo Galicia

Hacienda El, Vega Alta, Puerto Rico 00693, or any place he may be found.

3.      Defendant Rosellini Scientific, LLC ("**RS**") is a limited liability company

organized under the laws of the State of Texas and is a citizen of the State of Texas.  The sole

member of Rosellini Scientific, LLC was William Rosellini. Rosellini Scientific, LLC is not in good standing with the State of Texas.

4.    Defendant Rosellini Scientific Holdings, LLC ("**RSH**," who along with Rosellini and RS may be referred to as "**Defendants**") is a limited liability company organized under the laws and is a citizen of the Federation of Saint Christopher and Nevis.

## II. JURISDICTION AND VENUE

5.    The Court has jurisdiction over this lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different U.S. states and the amount in controversy exceeds $75,000.00, excluding interest and costs.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) as a substantial part of the events or omissions giving arise to this claim occurred in this district. Nexeon operated at a location within the Northern District of Texas. Blischak obtained the Agreed Judgment (defined below) in a court in Dallas County, Texas located within the Northern District of Texas.

## III. FACTS

A.    **Rosellini was the CEO, Chairman and majority owner of Nexeon.**

7.    Nexeon MedSystems, Inc. ("**Nexeon**") was incorporated in the State of Nevada on December 7, 2015. Rosellini is the former Chief Executive Officer and Chairman of the Board of Directors of Nexeon. Until April 2021, Rosellini, individually or through RS, RSH, or two trusts controlled by Rosellini, was the beneficial owner of the majority shares of Nexeon. Rosellini is believed to be the person now acting on behalf of Nexeon, a defunct corporation.

8.    Rosellini has six advanced degrees, including a law degree, a Master of Public Accounting degree, a Master of Business Administration and three other master's degrees.

Rosellini and his wife, Emily Rosellini, M.D. ("**Emily**"), reside in Puerto Rico, though Emily works in Dallas Texas.

**B.**    **MicroTransponder Stock**

9.    MicroTransponder, Inc. ("**MicroTransponder**" or "**MTI**") is a closely-held private corporation organized under the laws of Delaware. Transfers of MTI shares are restricted by the terms of the MicroTransponder Shareholder Agreement ("**MicroTransponder Shareholder Agreement**") which stipulates in pertinent part that, other than for transfers to the shareholder's spouse, immediate family, an inter-vivos trust, or certain entities and trusts owned exclusively by the shareholder and/or their immediate family for the benefit of the shareholder or their immediate family, shareholders are only permitted to transfer MTI shares for cash consideration, and only after first offering the shares to the corporation [MicroTransponder] and then to its shareholders, before selling the shares to a third party.

10.    Rosellini was issued 300 common shares of MTI in 2007. In 2014, Rosellini transferred 34 MTI shares to a close family member leaving him with 266 MTI shares. In 2014 and 2015, Rosellini transferred a total of One Hundred and Fifty-Six (156) MTI shares to Picus Group Trust. On information and belief, Rosellini is the beneficial owner of the MTI shares in the Picus Group Trust. As a result, since January 1, 2015 and through at least March 15, 2021, Rosellini has been the beneficial owner of Two Hundred Sixty Six (266) shares of common stock of MTI, with One Hundred Ten (110) MTI shares held directly in Rosellini's name, and One Hundred Fifty Six (156) MTI shares held in the name of Picus Group Trust.

11.    Through at least March 15, 2021, none of the following were current or former shareholders of MTI: Nexeon, RS, RSH, or Belltower Associates.

**C.**    **Rosellini causes Nexeon to transfer Nexeon stock and assets purportedly in exchange for MTI Stock.**

12.    On January 2, 2016, Nexeon entered into a Contribution Agreement ("**MTI Contribution Agreement**") with RS and RS's wholly owned subsidiary, Belltower Associates, LLC ("**Belltower**"), in which Nexeon issued 13,200,000 shares of Nexeon common stock (later reduced to 942,858 shares after a 1-for-14 reverse stock split), among other consideration.  In return, Rosellini, on behalf of RS, represented that RS would transfer 167 shares of MTI common stock to Nexeon.  (These 167 MTI shares, plus 100 MTI shares purportedly transferred to Nexeon under the subsequent MTI Stock Exchange Agreement described below will be referred to as the "**MTI Stock**").  Rosellini represented that RS had the full power and authority to consummate this transaction of transferring the MTI Stock to Nexeon.  Rosellini's actions were fraudulent for at least three reasons: (1) RS did not own any shares of MTI stock; (2) neither Rosellini nor RS offered the MTI Stock to MicroTransponder or its shareholders as required by the MTI Shareholder Agreement; and (3) the MTI Stock was never transferred to Nexeon.  Consequently, while RS received consideration from Nexeon under the MTI Contribution Agreement, Nexeon received zero MTI Stock, and little, if any other value (certain patent rights transferred to Nexeon had no value to Nexeon other than enabling Nexeon to claim that it met the minimum asset requirements for listing Nexeon stock on the OTC:QB exchange, and thereby positioning Rosellini to sell the Nexeon shares after statutory holding periods).  Further, Rosellini hid these facts from Nexeon's auditors, shareholders, and creditors despite representing that this transfer had occurred in Nexeon's numerous public filings with the United States Securities and Exchange Commission ("**SEC**").

**D.    Rosellini causes Nexeon to transfer Emeritus stock purportedly in exchange for MTI Stock.**

13.    On January 6, 2017, RS and Nexeon entered into a Stock Exchange Agreement ("**MTI Stock Exchange Agreement**") in which RS purportedly sold, transferred and assigned to Nexeon 100 shares of MTI stock in exchange for 591 shares of common stock of Emeritus Clinical Solutions, Inc. ("**Emeritus**").  Rosellini, on behalf of RS, represented that:

> "C.    The MTI Shares have been duly authorized, are validly issued, fully paid, and non-assessable, and are owned of record and beneficially by RS, free and clear of all liens, pledges, security interests, charges, claims, encumbrances, agreements, options, voting trusts, proxies, and other arrangements or restrictions of any kind ("*Liens*"), including but not limited to Liens of any applicable taxing authority. Upon consummation of the transactions contemplated by this Agreement, Nexeon shall own the MTI Shares free and clear of any and all Liens.
>
> D. The execution, delivery, and performance by RS of this Agreement do not conflict with, violate or result in the breach of, or create any Lien on the MTI Shares pursuant to any agreement, instrument, order, judgment, decree, law, or governmental regulation to which RS is a party or is subject or by which the MTI Shares are bound, other than State and Federal Securities laws, rules, and regulations."

However, again, RS did not own the MTI Stock; neither Rosellini nor RS offered the MTI stock to MicroTransponder or its shareholders; and the MTI Stock was never transferred to Nexeon. Consequently, Nexeon received zero value for this transfer.  And again, Rosellini hid these facts from Nexeon's auditors, shareholders, and creditors in numerous public filings with the SEC over the ensuing years.  Rosellini later stated that the rationale for the MTI Stock Exchange Agreement was that "we swapped Emeritus for MicroTransponder stock because the business [Emeritus] needs to be owned by a veteran to be viable," thereby advancing Rosellini's personal interests as an owner of Emeritus and RS over the interests of Nexeon and its creditors.

**E.      Blischak takes a Judgment against Nexeon.**

14.      On December 1, 2016, Blischak was hired as President of Nexeon.  By as early as January 2018, Nexeon was not timely paying its bills in the normal course of business and stopped timely paying Blischak compensation for his services as President.

15.      On September 11, 2018, Blischak filed a lawsuit in the 192nd Judicial District Court of Dallas County, Texas in Case No. DC-18-13350 styled *Brian Blischak v. Nexeon MedSystems, Inc.* (the "**Nexeon Lawsuit**").

16.      On March 20, 2019, the Court in the Nexeon Lawsuit granted Blischak's summary-judgment motion in part as to liability, leaving damages as the only issue to be determined.

17.      On November 6, 2019, the Court in the Nexeon Lawsuit entered an Agreed Judgment granting Blischak a judgment against Nexeon in the sum of Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00), plus pre-judgment and post-judgment interest (the "**Agreed Judgment**") with collection deferred until February 26, 2020 at Rosellini's request. Nexeon failed to pay the Agreed Judgment.

**F.      Rosellini causes Nexeon to enter the Leonite Securities Purchase Agreement.**

18.      On August 21, 2017, Rosellini, on behalf of Nexeon, and Leonite Capital, LLC ("**Leonite**") signed (via DocuSign) a Securities Purchase Agreement ("**Leonite SPA**") and a Security and Pledge Agreement ("**Leonite Pledge Agreement**").  Under the Leonite SPA, in consideration of payment of $1,000,000 by Leonite to Nexeon, Nexeon gave consideration of, and Leonite received, the following: (a) a Senior Secured Convertible Promissory Note with a principal amount of $1,120,000.00 (the "**Leonite Note**") which included a $120,000.00 original issue discount ("**OID**"); (b) a two-year warrant for the purchase of Two Hundred Fifty Thousand (250,000) shares of Nexeon common stock; (c) a five-year warrant for the purchase of Two

Hundred Fifty Thousand (250,000) shares of Nexeon common stock; and (d) One Hundred Thousand (100,000) shares of Nexeon restricted common stock. The interest rate under the Leonite Note was twelve percent (12%), and the default interest rate under the Leonite Note was twenty-four percent (24%). Section 5.9 of the Leonite Note stipulated that in no event would Nexeon be obligated to pay more than the maximum rate permitted under New York's criminal usury laws as follows:

> "…Notwithstanding any provision to the contrary contained in this Note, it is expressly agreed and provided that the total liability of the Borrower [Nexeon] under this Note for payments which under New York law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate")… If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Borrower to the Holder with respect to indebtedness evidenced by this Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Borrower, the manner of handling such excess to be at the Holder's election."

The maximum rate permitted under New York criminal usury law was, and is, twenty-five percent (25%).

19.    In connection with the Leonite SPA, RS gave Leonite a security interest in collateral, including two government contracts that are connected with a portion of the business of RS that was sold in 2016 to Emeritus, but which remain in the name of RS ("**Government Contracts**"). Nexeon's obligations under the Leonite SPA were further secured by a personal guaranty executed by Rosellini's father, Randy Michael Rosellini ("**Father**"), via a signed Affidavit and Confession of Judgment in the sum of $1,120,000.00 in favor of Leonite ("**Father's Guaranty**"), and a Deed of Trust from Roselancland Limited Partnership ("**Roselancland**"), an entity controlled by Father, in favor of Leonite related to certain real property in the State of Texas (the "**Texas Property**"). As consideration for acting as guarantor, Father received a two-year warrant for the purchase of Two Hundred Thousand (200,000) shares of Nexeon common stock

at $1.50 per share.  On the date that Father's warrants were issued, Nexeon's share price was $2.00 putting Father $50,000 "in the money."

20.    On or about November 17, 2017, Nexeon, through Rosellini, changed its transfer agent (from Action Stock Transfer Corporation to Equity Stock Transfer, LLC) without providing Leonite with fully executed Irrevocable Transfer Agent Instructions.  By this act, Nexeon defaulted under the Leonite Note which stipulated that Nexeon would default in the event it appointed a replacement transfer agent without providing Leonite with fully executed Irrevocable Transfer Agent Instructions.  Rosellini's actions were a breach of his fiduciary duty to Nexeon.

21.    On October 22, 2018, Nexeon missed a payment under the Leonite Note.

22.    On November 20, 2018, Rosellini, on behalf of Nexeon, signed (via DocuSign) the First Amendment to the Senior Secured Convertible Promissory Note (the "**First Amended Leonite Note**") with Leonite.  The First Amended Leonite Note references the missed October 2018 payment as the event of default, but does not mention a default due to Nexeon's failure, over a year earlier, to notify Leonite of Nexeon's November 17, 2017 replacement of transfer agents that Leonite would later assert.  The First Amended Leonite Note revised the payment schedule and extended the maturity date to December 31, 2019.  As additional consideration for the First Amended Leonite Note, Nexeon, through Rosellini, gave Leonite a seven percent (7%) economic interest in Nexeon's subsidiary MediLine SPRL ("**MediLine**"), consisting of seven percent (7%) of any dividends to be paid by MediLine (the "**MediLine Dividend Payment**") plus 7% of net proceeds of any future sale/alienation of MediLine (the "**MediLine Sale Net Proceeds**").

23.    On February 13, 2019, Leonite sent Nexeon notice that Nexeon was in default of the First Amended Leonite Note (the "**Leonite Default Notice**"), and that Leonite would

accelerate the amount owed based on a November 17, 2017 date of default. Leonite based the default on Nexeon's November 17, 2017 failure, through Rosellini, to provide Leonite with fully executed Irrevocable Transfer Agent Instructions prior to the effective date of the replacement of Nexeon's transfer agent as required by Section 4.15 of the Leonite Note.

24.    On March 12, 2019, Leonite sent a Notice of Foreclosure Sale (the "**Texas Foreclosure**"), scheduling a sale of the Texas Property for April 2, 2019. Shortly thereafter, Father, on behalf of Roselancland, filed a lawsuit in the 191st Judicial District Court of Dallas County, Texas in Case No. DC-19-04437 seeking a temporary restraining order against Leonite (the "**Roselancland Lawsuit**"). On March 29, 2019, the court in the Roselancland Lawsuit stayed the Texas Foreclosure. Also, on March 29, 2019, Leonite filed suit against Nexeon in the Supreme Court of the State of New York, County of Rockland, in Index No. 031644/2019 (the "**Leonite-Nexeon New York Case**") and, contemporaneously, filed suit against Father in Index No. 031644/2019 (the "**Leonite-Father New York Case**") seeking to order payment of Father's Guaranty. On that same date, Avi Geller ("**Geller**"), Chief Investment Officer of Leonite, filed an Affidavit ("**Geller Affidavit**") in the Leonite-Nexeon New York Case seeking to collect a total of $1,638,945.45 by claiming that the Leonite Note was in default. In the Geller Affidavit, Geller testified that:

      a.  Nexeon had paid $22,400 in interest for September and October 2017;

      b.  Nexeon had paid $219,000 in interest since October 2017; and

      c.  Nexeon owed $1,397,359.45 in principal and interest as of the February 13, 2019 notice of default date (which included $496,359.45 in default interest plus statutory interest under New York law, attorney's fees and costs).

25.     On May 17, 2019, Nexeon, through Rosellini (via DocuSign), and Leonite entered into a [First] Forbearance Agreement (the "**First Leonite Forbearance Agreement**") pursuant to which Leonite agreed to forbear for a period of 60 days (until July 16, 2019) any further exercise of its rights and remedies with respect to Nexeon's default with regard to the Texas Foreclosure, the Leonite-Father New York Case (Father's Guaranty), and the Government Contracts owned in the name of RS, but notably not related to any of Nexeon's collateral which Leonite continued to pursue.  In signing the First Leonite Forbearance Agreement, Rosellini caused Nexeon to agree to pay $1,359,196.05 plus a forbearance fee of $75,000.00 which was added to the Principal of the Leonite Note, but which would not be subject to Father's Guaranty.

26.     On July 16, 2019, Leonite and Nexeon, through Rosellini (via DocuSign), entered into a [Second] Forbearance Agreement (the "**Second Leonite Forbearance Agreement**") pursuant to which Leonite agreed to forbear until September 30, 2019 again with regard to the Texas Foreclosure, the Leonite-Father New York Case (Father's Guaranty), and the Government Contracts owned by RS, but, again, not related to any of Nexeon's collateral.  In signing the Second Leonite Forbearance Agreement, Rosellini caused Nexeon to agree to pay at least $650,000 from the proceeds of the 2018 Puerto Rican tax credit, plus an additional forbearance fee of $50,000.00 which was added to the principal of the Leonite Note, but which would not be subject to Father's Guaranty.

27.     On August 27, 2019, Leonite was paid approximately $650,000 by Nexeon from proceeds of the sale of the 2018 Puerto Rican tax credit.

28.     On October 7, 2019, Rosellini, on behalf of Nexeon's subsidiaries Nexeon MedSystems Belgium SPRL ("**NMB**") and Ingest SPRL ("**Ingest**"), signed an agreement to sell MediLine to SEM Management ("**MediLine Sale**") for €2,900,000 (approximately $3.2 million)

plus up to €400,000 (approximately $440,000) in earnouts ("**MediLine Sale Earnout(s)**") to be paid to NMB in two installments of €200,000 each no later than June 30 , 2020 and June 30, 2021 respectively based on the attainment of specified MediLine revenues in calendar year 2019 and 2020.   The agreement contained various conditions precedent to closing and would close approximately two weeks later.

29.    On October 9, 2019, Rosellini emailed Blischak stating "Leonite was paid in full." Rosellini provided a schedule showing Leonite would receive €902,053.93 ($990,832.52 at the 0.9104 USD:EUR exchange rate quoted in the schedule).  On October 24, 2019, Leonite received the funds from the MediLine Sale.  Therefore, by October 24, 2019, Leonite had received approximately $1,882,432.52 in cash consisting of:

   a.   $22,400 and $219,200 in interest as described in the March 29, 2019 Geller Affidavit; plus

   b.   $650,000 from the 2018 Puerto Rican Tax Credit; plus

   c.   $990,832.52 from the MediLine Sale.

30.    Despite receiving these amounts, Leonite continued to seek the MediLine Sale Net Proceeds acquired in the November 20, 2018 First Amended Leonite Note which Leonite calculated to equal $225,246.00 plus interest.

31.    On about February 27, 2020, Leonite and Nexeon, by Rosellini, signed a Senior Secured Convertible Promissory Note Second Amendment (the "**Second Amended Leonite Note**").  Under the Second Amended Leonite Note, Rosellini caused Nexeon to agree to pay to Leonite the following:

   i.   "The sum of $225,246.00 on or before June 30, 2020 (related to the 7% interest held by Leonite in Nexeon MedSystems Europe S.A.R.L.);
   ii.   The sum of $21,172.09 on or before June 30, 2020 (The outstanding principal and interest agreed upon, due as of the Date herein);

     iii.  The sum of $17,500.00 on or before June 30, 3020 (See paragraph 2(b) [Rosellini agreed for Nexeon to pay fees related to the Roselancland Lawsuit]);

     iv.  Within 30 days of receipt, 7% of all future proceeds it receives as milestone payments, "true ups" or otherwise related to the sale of the Medi-line assets. Therefore any payment received from Medi-line by William Rosellini or any entity in which William Rosellini has an interest shall require a payment of 7% to Leonite of such payment.

     v.  All of the above sums shall be considered part of the Nexeon debt set forth in the Note and First Amendment. Holder shall be entitled to all of its rights and remedies for payment of said sums set forth in said documents."

32.    By February 27, 2020 Rosellini knew that the 2019 MediLine revenue goal had been met, and that consequently SEM Management would make the first €200,000 MediLine Sale Earnout payment before June 30, 2020. Rosellini constructed the Second Amended Leonite Note payment due dates to match. Upon information and belief, Rosellini directed the first €200,000 MediLine Sale Earnout to Leonite to satisfy the terms of the Second Amended Leonite Note. Upon information and belief, a second €200,000 MediLine Sale Earnout payment was made by SEM Management to NMB on or before June 30, 2021.

33.    Upon information and belief, Rosellini caused Nexeon to agree to and pay more than twenty-five percent (25%) interest per annum under the Leonite Note.

34.    Rosellini knew that Nexeon paid Leonite amounts that exceeded the maximum twenty-five percent (25%) interest rate under New York State's "loan sharking" laws such that Leonite violated New York's criminal usury statute. Additionally, Rosellini knew such payments violated Section 5.9 of the Leonite Note, and caused Nexeon to make the payments. Rosellini failed to seek the return to Nexeon of amounts in excess of this maximum rate as required by the Leonite Note. In doing so, Rosellini failed to protect Nexeon's creditors by causing Nexeon to pay Leonite sums in excess of that allowed by the Leonite Note and by New York law. Instead, Rosellini asserted Leonite's interest in May 18, 2021 and June 23, 2021 court filings and in a July

21, 2021 hearing in Blischak's post-judgment efforts to collect the Agreed Judgment. Leonite's

agent stated that Leonite "had an arrangement with Rosellini."

     35.    Under SEC Regulations, Nexeon was required to file Form 8-K Current Reports

*Item 2.04 Triggering Events That Accelerate or Increase a Direct Financial Obligation or an*

*Obligation under an Off-Balance Sheet Arrangement* within four (4) business days of each of the

following events:

- The November 20, 2018 First Leonite Note Amendment;
- The February 13, 2019 receipt of Leonite Notice of Default;
- The May 17, 2019 First Leonite Forbearance Agreement;
- The July 16, 2019 Second Leonite Forbearance Agreement; and
- The February 27, 2020 Second Leonite Note Amendment.

Rosellini failed to cause Nexeon to file such reports with the SEC, each of which constitutes a

breach of Rosellini's fiduciary duty. Rosellini's failure to make these required SEC disclosures

enabled Leonite's violation of New York's criminal usury statute to go undetected. Rosellini's

actions or omissions damaged Nexeon's creditors by reducing the assets available to satisfy claims

of other creditors.

**G.**    **Rosellini and Nexeon are investigated by the HHS and OIG.**

     36.    On September 12, 2018, Nexeon's Puerto Rico subsidiary, Nexeon Puerto Rico

Operating Company ("**NXPROC**"), received NIH Grant U44NS108148-01 from the National

Institute of Neurological Disorders and Stroke of the National Institutes of Health ("**NIH**") (the

"**NIH Grant**"). Phase 1 (year 1) of the NIH Grant paid NXPROC the sum of $838,241. Pursuant

to satisfactory completion of Phase 1, NXPROC would be eligible to receive an additional

$448,926 and $267,308 for Phase 2 (year 2) and Phase 3 (year 3), respectively.

     37.    On November 7, 2018, Rosellini received an email from Michael Torrisi, Senior

Counsel, Office of the Inspector General ("**OIG**"), for the United States Department of Health and

Human Services ("**HHS**"), thereby initiating an investigation (the "**OIG Fraud Investigation**") involving multiple violations of the Civil Monetary Penalties Law made by Rosellini and the Nexeon subsidiaries (the "**Nexeon Parties**") for three Small Business Innovation Research awards, including the NIH Grant.

38.     The OIG contended that "Respondent Parties [Rosellini and Nexeon] knowingly submitted specified claims to HHS that Respondent knew or should have known were false in violation of 42 USC 1320a-7a(o)(1)…"

39.     This complaint was referred to the OIG by HHS.  HHS contended that:

"Between July 2017 and September 2018, the National Institutes of Health (NIH) awarded three Small Business Innovation Research (SBIR) awards to Pulsus Medical and Nexeon PR: R43-HL135918; R44HL129870 and U44-NS108148. … HHS contends that the Nexeon parties drew down award of funds from the HHS Payment Management System [("**PMS**")] that were (1) sent to an overseas affiliate without NIH approval, in violation of NIH SBIR requirements; (2) based upon quotes and other potential costs that were never incurred; (3) comingled among various affiliates and used for unallowable costs unrelated to the NIH SBIR awards; and (4) not supported by adequate documentation to ensure that the funds were used for allowable costs in accordance with the terms and conditions of the awards."

40.     On January 15, 2020, as part of the OIG Fraud Investigation, Rosellini completed and submitted a "Financial Disclosure Form – Business Organization" (the "**OIG Disclosure**") on behalf of Nexeon.  The OIG Disclosure form states "The principal purpose in gathering this information is to evaluate your ability to pay the United States Government's claim against you." Rosellini signed the OIG Disclosure subject to penalty of perjury in which he stated "I declare that I have examined the information given in this statement and, to the best of my knowledge and belief, it is true, correct, and complete, and I further declare that I have no assets, owned either directly or indirectly, or income of any nature other than that as shown in this statement, including any attachment."  In the OIG Disclosure, Rosellini represented that:  (a) Nexeon had 264 shares of stock in MicroTransponder with a declared value of "$private company"; (b) Nexeon's only other

asset was "Siemens non-exclusive license 86 patents" with a current value of "$?"; and (c) the only asset transferred from Nexeon in the last five years was the sale of "MediLine for $3.2M in Q3, 2019 and all proceeds went to debtors."  Significantly, Rosellini failed to disclose that the MediLine Sale also included €400,000 in MediLine Sale Earnout payments payable to NMB in 2020 and 2021.  Further, Rosellini failed to disclose that Nexeon had transferred the stock of NMB (along with the Synapse Device (discussed below) and €400,000 in MediLine Sale Earnout payments) to Nuviant (an entity which is 70% owned by RSH and 10% by Nexeon).  The date and sources and uses of proceeds of the NMB transfer were likewise undisclosed.  Rosellini also failed to disclose Nexeon's 10% stake in Nuviant.  Significantly, Rosellini swore that he did not know the fair market value of the MicroTransponder shares, and yet Rosellini now claims in the FirstFire Repayment Agreement purportedly executed on the very same day that he paid (and therefore knew) the fair market value for the MicroTransponder shares (discussed below).  In Section 4(c) of the OIG Disclosure, Nexeon, through Rosellini, was required to disclose "any judgments or liens against the business."  Rosellini disclosed the Agreed Judgment owed to Blischak but did not disclose any liens in favor of Leonite or FirstFire (discussed herein).  In Section 5(d), Rosellini was required to disclose all business assets and encumbrances, including any Uniform Commercial Code ("**UCC**") filings.  Rosellini did not disclose any UCC filings.  Nexeon was also required to attach a "current statement from lender with monthly payment amount and current balance for assets listed that have an encumbrance."  Rosellini did not include any such statements.  Also, significantly, Rosellini did not disclose that he was personally owed $50,311 by Nexeon (which Rosellini now claims in the FirstFire Repayment Agreement purportedly executed on the very same day (discussed below)).

41.    On or about July 10, 2020, Rosellini amended the OIG Disclosure ("OIG Disclosure Amendment") by sending a PDF titled "Mina Mar Group proposal to NXNN 070720 mz signed" and an Excel spreadsheet titled "NXNN 2020 debt scheduled" to OIG.  The Excel spreadsheet details Nexeon's and its subsidiaries' accrued liabilities, accounts payable, and loan balances as of June 29, 2020.  Between July 5 and July 10, 2020 Rosellini modified a spreadsheet of the same name that Rosellini had sent to Zecevic on June 29, 2020(discussed below) in three pertinent ways, specifically Rosellini:  (i) added "Senior Secured Note – FirstFire Capital $70,000" (contradicting Rosellini's assertion that Rosellini had by then assumed this debt under the purported FirstFire Repayment Agreement which Rosellini dated January 15, 2020 (discussed below)); (ii) deleted "Leonite Capital LLC, Senior Secured Note" and "Leonite Capital LLC Pre-Payment Penalty" totaling $1,245,600 (consistent with Leonite being fully paid with proceeds from the MediLine Sale and earnout (discussed above) and contradicting Rosellini's current claim that Leonite secured debt is unpaid); and (iii) deleted the note "Excludes below Salary and Wages for Emily Rosellini to continue accrual" (because Rosellini had failed to disclose to OIG that his wife, Emily, had received funds from the NIH Grant, and doing so now would expose Rosellini to paying additional restitution to OIG).

42.    Significantly, at no time has Rosellini ever disclosed to OIG that Nexeon transferred the MTI Stock to Rosellini on January 15, 2020 as he now alleges.

43.    On September 15, 2020, Rosellini signed (via DocuSign) "individually and in his capacity as CEO of Nexeon MedSystems Inc., Pulsus Medical LLC, and Nexeon MedSystems Puerto Rico Operating Company, Inc." a Settlement Agreement with OIG (the "**OIG Settlement Agreement**") related to submitting fraudulent claims and co-mingling funds amongst Nexeon affiliates.  Under the terms of the OIG Settlement Agreement: (a) Rosellini agreed to pay $20,000,

all of which was restitution; (b) the Nexeon Parties agreed to pay $30,000, all of which was restitution; and (c) Rosellini (personally) and the Nexeon Parties were added to the "Exclusions" list for all Federal health programs for at least five (5) years at which time they could apply to be removed from the exclusions list.

44.     On September 15, 2020, Rosellini also signed (via DocuSign) "individually and in his capacity as CEO of Pulsus Medical LLC, Nexeon MedSystems Puerto Rico Operating Company, Inc. and Nexeon MedSystems Inc., a Voluntary Debarment Agreement with HHS (the "**HHS Voluntary Debarment Agreement**") related to submitting fraudulent claims and co-mingling funds amongst Nexeon affiliates. Under the terms of the HHS Voluntary Debarment Agreement, Rosellini (personally) and the Nexeon Parties agreed to be debarred under 2 C.F.R. 180 for a period of [at least] five years. The debarment has government-wide effect.

45.     A lawyer by training, Rosellini certainly understood that both he (personally) and Nexeon were facing civil monetary penalties, assessments, and exclusion. As a result, on information and belief, Rosellini began moving assets out of his name and out of the country before submitting the January 15, 2020 OIG Disclosure.

46.     Further, Rosellini knew, or should have known, that if Rosellini was added to the government's "Exclusions" list, this would extend to all his affiliated entities, and that the value of his share of the Emeritus business would be significantly decreased if the Government Contracts that RS had pledged to Leonite were cancelled. The Government Contracts are for the provision of services to the United States Department of Veteran's Affairs ("**VA**"), and on information and belief represent a significant portion of Emeritus' revenue, and that without this revenue Emeritus would not be viable. Rosellini founded Emeritus as Telemend, however, on information and belief, Rosellini installed a female minority as Managing Partner and a military veteran as

President/CEO, as the purported owners of Emeritus to take advantage of preferences for women/minorities and veterans. Rosellini remained a hidden, significant shareholder in Emeritus, and added to his Emeritus holdings when he purportedly traded MTI Stock for Emeritus stock in the aforementioned MTI Stock Exchange Agreement. The female minority owner of Emeritus was concurrently on the payroll at Nexeon's subsidiary, to the benefit of Rosellini's personal interests while Nexeon's subsidiary paid her salary from at least January 2016 until January 2019.

**H.**    **Nexeon becomes insolvent, receives an SEC Subpoena, and is garnished by the TWC.**

47.    As part of the OIG Fraud Investigation, OIG requested and Nexeon submitted monthly profit and loss statements and balance sheets for the year 2018. The profit and loss statements show that for the full calendar year 2018, Nexeon lost $2,969,696.74 on $93,338.10 in ordinary income (revenues). The balance sheets show that Nexeon was insolvent as early as January 2018, and its financial situation continued to deteriorate through December 2018 and beyond. Specifically, Nexeon's balance sheet showed that current liabilities exceeded current assets by about $300,000 on January 31, 2018:

a.    $24,283.22 in current assets, consisting of $20,176.20 in cash, $0.00 in accounts receivable and $4,107.02 in prepaid expenses

b.    $319,991.97 in current liabilities which included $244,666.71 in accounts payable, $10,860.90 in credit card, and $64,464.36 in payroll liabilities.

48.    By December 31, 2018, Nexeon's balance sheet had deteriorated significantly, and current liabilities exceeded current assets by approximately $950,000:

a.    $41,172.98 in current assets, consisting of $13,890.43 in cash, $2,937.91 in accounts receivable and $24,344.63 in prepaid expenses; and

b. $1,000,358.89 in current liabilities which included $446,359.11 in accounts payable, $12,779.12 for credit cards, $420,940.62 in earned but unpaid payroll liabilities.

49.     On December 14, 2018, Rosellini and Nexeon were subpoenaed by the SEC (the "**Nexeon/Rosellini SEC Subpoena**") concerning a complaint of unpaid compensation, and the accuracy of certain statements made in Nexeon's recent S-1 filing.  In Nexeon's response to the SEC, Nexeon reported that, as of December 31, 2018, the total unpaid compensation owed by Nexeon and its subsidiaries, was $1,352,680.94 ($420,940.62 at Nexeon and the balance at its subsidiaries).  Nexeon, through Rosellini submitted a December 2018 90-day cash flow analysis to the SEC showing that by December 2018, Nexeon was not paying its debts as they became due.

50.     In January 2019, the Texas Workforce Commission ("**TWC**") garnished Nexeon's U.S. bank accounts to collect wage claims for two Texas-based employees.  The funds in the bank accounts were insufficient to pay the full claim amount, and all of Nexeon's U.S. bank accounts were closed.

## I.     Rosellini causes Nexeon to engage in the FirstFire Transaction.

51.     Despite the fact that: (i) Nexeon was insolvent; (ii) Rosellini had caused Nexeon to pledge substantially all, if not the entirety, of Nexeon's assets to Leonite under the Leonite SPA (that was in default); and (iii) Blischak had obtained a partial summary judgment in the Nexeon Lawsuit, Rosellini caused Nexeon to take on further debt.  On May 29, 2019, Rosellini, on behalf of Nexeon, signed (via DocuSign) a Securities Purchase Agreement (the "**FirstFire SPA**") with FirstFire Global Opportunities Fund, LLC, ("**FirstFire**") a Delaware limited liability company. Pursuant to the FirstFire SPA, FirstFire purchased a unit consisting of:  (a) a Senior Secured Convertible Promissory Note (the "**FirstFire Note**") signed by Rosellini, on behalf of Nexeon, in

the principal amount of up to $250,000 which included an original issue discount of ten percent of any tranche; (b) warrants to purchase an amount of shares of Nexeon's Common Stock equal to 75% of the face value of the respective tranche divided by $2.50 (the "**FirstFire Warrants**"), and (c) 10,000 shares of Nexeon's Common Stock (the "**FirstFire Commitment Shares**"). The debt under the FirstFire Note accrued interest at the rate of 5.0% per annum and the maturity date was nine (9) months from the effective date of each tranche at which time each respective tranche as well as any accrued and unpaid interest and other fees relating to that respective tranche, was due and payable. The FirstFire Note was a senior secured obligation of Nexeon, with priority over all existing and future indebtedness of Nexeon except with respect to the Leonite SPA. The closing price of Nexeon Common Stock on May 29, 2019 was $1.12 per share giving the FirstFire Commitment Shares a face value of $11,200. The first tranche of funds included a $10,000 original issue discount, and 30,000 Warrants. The value of the warrants and stock conversion option was not estimated at the time. Rosellini also signed an Affidavit of Confession of Judgment binding Nexeon and Rosellini, personally.

52.     Also, on or about May 29, 2019, Rosellini signed (via DocuSign) a Corporate Resolution of the Board of Directors of Nexeon (the "**FirstFire Board Resolution**") purportedly authorizing Nexeon to enter the FirstFire SPA including issuing commitment shares and warrants of Nexeon. The other two listed Directors of Nexeon, Kent George and Michael Neitzel, did not sign the FirstFire Board Resolution. Nevada law requires the board to approve the issuance of shares and share rights. Rosellini's unilateral action was ultra vires and a breach of his fiduciary duty.

53.     On May 29, 2019, Rosellini also signed (via DocuSign) a Disbursement Authorization (the "**FirstFire Disbursement Authorization**") directing FirstFire to disburse the

first $100,000 tranche ($90,000 net of original issue discount).  However, the FirstFire funds were not disbursed to Nexeon, but instead disbursed to Nexeon MedSystems Belgium ("**NMB**") and consequently Nexeon received zero value from the FirstFire SPA.  Furthermore, Rosellini attempted to conceal the recipient of the funds by later sending Plaintiff a signed, purported Disbursement Authorization with the "Schedule A" wiring instruction blank.

54.     On May 29, 2019, Rosellini also signed (via DocuSign) an Officer's Certificate (the "**FirstFire Officer's Certificate**") in connection with the FirstFire SPA.  In the FirstFire Officer's Certificate, Rosellini certified that "There has been no adverse change in the business, affairs, prospects, operations, properties, assets or condition of the Company since the date of the Company's most recent financial statements filed with the United States Securities and Exchange Commission, other than losses and matters which would not, individually or in the aggregate, have a Material Adverse Effect (as defined in the Purchase Agreement)."  The date of the most recent financial statements filed with the SEC by Nexeon prior to May 29, 2019 was November 19, 2018 for the period ending September 30, 2018.  Notably, since September 30, 2018, the following material adverse changes in the Nexeon business had occurred, making Rosellini's representation, grossly untrue:

      a.  All of the employees of Nexeon, and Nexeon's subsidiaries, NXPROC, NMB and Pulsus (except for Rosellini and CFO Chris Miller) had been terminated by Rosellini.

      b.  All of Nexeon's U.S. bank accounts were closed after being garnished by TWC as a result of non-payment of employee wages.

      c.  An active investigation had been initiated by OIG/HHS which exposed Nexeon and/or its affiliates to pay restitution of $838,241; disqualified Nexeon from

receiving $716,234 in phase 2 and 3 funding of the NIH Grant; and could disqualify

Nexeon from eligibility for any future U.S. government grants for some period.

d.    An active SEC investigation had been initiated and was underway which prevented

Nexeon from raising cash by selling stock until the investigation was complete.

e.    The Ion Catheter contract was cancelled eliminating $820,035 in January 2019

revenue.

f.    Nexeon defaulted on the Leonite Loan (twice) and Father failed to perform under

Father's Guaranty.  As a result, Rosellini signed the First Amended Leonite Note

(granting Leonite a 7% economic interest in MediLine (later valued at

approximately $225,000), and the First Leonite Forbearance Agreement (agreeing

to pay over $495,000 in default interest and a $75,000 forbearance fee).

g.    On March 20, 2019, Blischak was awarded a summary judgment in the Nexeon

Lawsuit, exposing Nexeon to up to $400,000 in damages.

55.    Rosellini directed the funds from the Leonite SPA to NMB, on information and

belief, to develop and deliver samples of a medical device (the "**Synapse Device**") under a

Development, Licensing and Supply Agreement (the "**Bionics Agreement**") with the Bionics

Institute ("**Bionics**"), an Australian entity.  Rosellini signed (via DocuSign) the Bionics Agreement

on May 21, 2019 (8 days before the FirstFire SPA) on behalf of Nexeon.  Rosellini subsequently,

through a complex combination of:  (i) the Bionics Agreement; (ii) an agreement with An Bobbaers

("**Bobbaers Agreement**") signed by Rosellini (via DocuSign) on June 13, 2019 (14 days after the

FirstFire SPA) on behalf of 5 entities (Nexeon, NMB, Nuviant, RSH and Rosellini (individually)),

and (iii) on information and belief, other undisclosed agreements with Nexeon and/or its

subsidiaries:  (a) caused Nexeon to transfer the stock in NMB (including rights to the Synapse

Device and the €400,000 MediLine Sale Earnouts) to Nuviant for little or no consideration; and (b) according to Rosellini's August 5, 2020 email to Blischak, caused RSH to own ~70% of Nuviant, also for little or no consideration. Consequently, Rosellini entered the FirstFire SPA, and the contemporaneous Bionics Agreement and Bobbaers Agreement with the knowledge and intention of providing NMB with funds to advance the Synapse Device, for Rosellini's personal benefit. All of this occurred during the OIG Fraud Investigation, while Nexeon was a publicly-traded company without any required SEC disclosures or disclosure to OIG.

56.    On February 29, 2020 Nexeon defaulted on the FirstFire Note.

57.    On April 17, 2020, Rosellini as CEO, on behalf of Nexeon, signed a [First] Payoff Agreement (the "**FirstFire First Payoff Agreement**") with FirstFire (this agreement has not previously been produced by Nexeon, but is referenced in the Second Payoff Agreement dated July 27, 2020). Rosellini signed the FirstFire First Payoff Agreement without authority from the Board of this defunct corporation. Apparently, under the FirstFire First Payoff Agreement, Nexeon, through Rosellini, and FirstFire agreed that Nexeon would pay FirstFire "$70,000 before December 24, 2020" and "$40,000 of payments have been made to date." Significantly, the very existence of this agreement contradicts Rosellini's claim that Rosellini assumed this debt under a purported FirstFire Repayment Agreement dated January 15, 2020.

58.    On July 27, 2020, Rosellini as CEO, on behalf of Nexeon, signed (via DocuSign) a Second Payoff Agreement (the "**FirstFire Second Payoff Agreement**") with FirstFire, again without authority from the Board of this defunct corporation. The FirstFire Second Payoff Agreement references the FirstFire First Payoff Agreement and states that: (a) $40,000 of payments have been made to date, and (b) "if [Nexeon] pays a total of $18,750 by overnight check on July 27, 2020, the entire amount owed under the Note shall be satisfied in its entirety." The

FirstFire Second Payoff Agreement was not filed with the SEC, nor was it disclosed to Blischak until a May 18, 2021 court filing in which Rosellini first claimed that the document proved that Rosellini had purchased the MTI Stock under a purported January 15, 2020 FirstFire Repayment Agreement. Significantly, like the FirstFire First Payoff Agreement, the very existence of this agreement contradicts Rosellini's claim that he assumed this debt under a purported FirstFire Repayment Agreement dated January 15, 2020 (discussed below). The agreement was not signed by Rosellini (individual) and does not mention the FirstFire Repayment Agreement.

59.    Under SEC Regulations, Rosellini, on behalf of Nexeon, was required to disclose the FirstFire SPA and all related documents in Form 8-K filings (e.g., Current Reports *Item 1.01,* Entry into a Material Agreement, and/or Item 2.03 Creation of a Direct Financial Obligation) within four (4) business days of entering: (a) the March 29, 2019 FirstFire SPA; (b) the April 17, 2020 FirstFire First Payoff Agreement; and (c) the July 27, 2020 FirstFire Second Payoff Agreement. Rosellini failed to cause Nexeon to file any such reports with the SEC, each of which constitutes a breach of Rosellini's fiduciary duty. Rosellini failed to keep adequate financial records of the FirstFire transaction. Rosellini violated Nevada law by: (a) issuing shares and share rights without Board approval; and (b) entering into payoff agreements without legal authority when the corporate charter was revoked. Rosellini's actions or omissions damaged Nexeon's creditors by causing Nexeon to assume responsibility for debt incurred by NMB, and thereby reducing the assets available to satisfy claims of Nexeon's other creditors.

60.    On September 15, 2020 – not coincidentally the same date Rosellini sought to resolve the OIG Fraud Investigation by signing the OIG Settlement Agreement (via DocuSign) and the HHS Voluntary Debarment Agreement (via DocuSign) – Rosellini created a document in PDF format entitled Loan Repayment Agreement & Transfer of MicroTransponder Stock (the

"**FirstFire Repayment Agreement**"), back-dated it to January 15, 2020, and signed it via hand signature, rather than his normal practice of signing via DocuSign.  Rosellini signed the agreement on behalf of himself, individually, and as Chief Executive Officer of Nexeon (without authority).  Under the FirstFire Repayment Agreement, Rosellini claims to have contributed $50,311 to Nexeon at an undisclosed time before January 15, 2020 (though Rosellini failed to disclose this in the OIG Disclosure or OIG Disclosure Amendment), and agreed to satisfy the Nexeon obligation to FirstFire or pay an additional $100,000 to FirstFire "on [sic] February 2020" (though Rosellini contradicts this in the OIG Disclosure Amendment which shows that as of June 29, 2020 Nexeon owed FirstFire $70,000).  Rosellini contributed no new consideration and, in fact, offered less because Rosellini had given FirstFire a personal guaranty to pay the "Default Amount" (defined in the FirstFire Note as the principal ($100,000) plus accrued interest at 5% (including default interest at 15%) multiplied by 150%).  In return, Rosellini would receive two hundred sixty-seven (267) shares of stock in MicroTranspander effective January 15, 2020 (though Rosellini failed to disclose this asset transfer in the January 15, 2020 OIG Disclosure, or the subsequent July 7, 2020 OIG Disclosure Amendment, or in his personal OIG disclosure, or in required SEC disclosures; or attempt to notify MTI to record the transfer as stipulated).  Rosellini did not obtain a valuation for the MTI Stock (and to the contrary, swore under penalty of perjury in the OIG Disclosure that he was unable to determine the fair market value of the MTI Stock on the exact same date that he now claims to have purchased the stock); did not comply with the terms of the MTI Shareholder Agreement; and did not get consent from any purported security interest holders.  Rosellini represented in the FirstFire Repayment Agreement that there were no legal actions or suits pending (though the OIG Fraud Investigation was on-going).  Rosellini represented in the FirstFire Repayment Agreement that the MTI Stock was transferred free of any liens, but subsequently

asserted in a May 18, 2021 court filing in the Nexeon Lawsuit titled "Real Party in Interest William Rosellini's Response in Opposition to Motion for Turnover" that the MTI Stock was subject to a senior secured interest in favor of Leonite. Rosellini continued to put his personal interests before Nexeon's creditors.

61. The FirstFire Repayment Agreement violates the terms of the MicroTransponder Shareholder Agreement which requires that the MTI Stock may only be transferred for cash consideration, and only after first offering the shares to MTI, and then to MTI shareholders, before selling the shares to a third party.

62. The FirstFire Repayment Agreement also violates Nevada law because: (a) Nexeon's corporate charter had been revoked; (b) all Nexeon assets were held in trust with the Board, so Rosellini, as CEO, lacked authority to transfer them; and (c) the proceeds of any asset sale were required to be distributed first to the Nevada SOS for any amounts due the State, and then to creditors as applicable to insolvent corporations. If Nexeon had offered to sell the MTI Stock for $100,000 cash on January 15, 2020, (equivalent to $374.53/share, calculated by dividing $100,000 by 267) as required under the MTI Shareholder Agreement, then: (a) MTI would have executed its option and purchased the MTI stock for $100,000 because it is a fraction of its fair market value; (b) the $100,000 paid by MTI would have been disbursed approximately $60,000 to Nevada and the balance of approximately $40,000 to any creditors; (c) Rosellini would have remained responsible for paying off the FirstFire Note subject to his personal guaranty, and FirstFire would have filed the Affidavit of Confession, and received an order for Rosellini to pay; and (d) Rosellini would have been relegated to attempting to substantiate and collect his unsecured $50,311 claim amongst other unsecured creditors; and (e) Rosellini would receive zero MTI

shares.  Rosellini's purported purchase of MTI Stock was clearly self-dealing, and Rosellini sought to place his personal interests ahead of Nexeon's creditors, including Plaintiff.

63.    Rosellini knew the fair market value of the MTI Stock was much greater than $374.53 per share.  On October 16, 2019 Rosellini stated in an email to Blischak, "MicroTransponder stock has a definitive [sic] value, so we can transfer it but you will have to value it appropriately.  The last round [Series D in November 2017] was struck at $5200 per share, you can take a liquidity discount but no more than the judge might do at trial."  $374.53 represents a 93% discount to the November 2017 $5200 Series D share price, or 7% of the Series D share price.  Further, Rosellini knew that the price of MTI stock had increased in an undisclosed funding round completed by MTI after November 2017, and increased again in July 2020 after MTI completed its clinical study in July 2020 – an additional reason why Rosellini back-dated the FirstFire Repayment Agreement from September 2020 to January 15, 2020.  Further, Rosellini only claims to have paid $58,750 for the MTI Stock (equivalent to $220.04/share, calculated by dividing $58,750 by 267) representing a 96% discount to the obsolete Series D share price.

64.    Rosellini made no attempt to obtain a valuation for the MTI Stock.  Under Delaware Shareholder Rights laws, Rosellini and/or Nexeon as, MTI shareholders, would have the right to inspect MTI's corporate books and records to, in pertinent part, determine the value of their shareholdings.  Rosellini made no attempt to obtain any information – not even to confirm the Series D stock price, or the price of subsequent financing activities – from MTI to attempt to value the MTI Stock.

65.    On January 15, 2020 Rosellini swore under penalty of perjury in the OIG Disclosure that the fair market value of the MTI Stock was "$private company," that is, unknown

– and Rosellini now claims that concurrently on January 15, 2020, without any documentation whatsoever, that Rosellini paid (and ergo knew) fair market value for the MTI Stock.

**J.**     **Rosellini enters a transaction with Miro Zecevic for Rosellini's benefit and to hinder, delay and defraud Nexeon's creditors.**

66.     On February 22, 2016, as part of Nexeon's preparation to begin publicly trading its shares, Nexeon amended its Articles of Incorporation to prohibit the issuance of preferred stock such that Nexeon would have only one class of stock – common stock.  Nexeon's Articles of Incorporation, as amended, state:

> "Article IX of the Articles of Incorporation of Nexeon MedSystems, Inc is hereby deleted in its entirety and is hereby replaced with the following:

> ### Article IX

> This corporation is authorized to issue one class of stock to be designated "Common Stock."  The total number of shares of Common Stock which this Corporation is authorized to issue is 75,000,000 shares with a par value of $0.001 per share. Each share of Common Stock issued and outstanding shall be identical in all respects with the other.  In the event any dividend is paid on any share of Common Stock, the same dividend shall be paid on all shares of Common Stock outstanding at the time of such payment.  Except for and subject to those rights expressly granted to the holders of Preferred Stock, if any, or except as may be provided by the Laws of the State of Nevada.

67.     On November 19, 2018, Nexeon filed a Form 10-Q with the SEC.  The Form 10-Q was signed by Rosellini as CEO and Christopher Miller as CFO.  At that time, Nexeon had 1,965,646 shares of common stock and no preferred stock.

68.     On July 3, 2020, Miro Zecevic ("**Zecevic**") sent a proposal to Rosellini, in which he referenced a June 29, 2020 email from Rosellini with a link to an Excel spreadsheet titled "NXNN 2020 debt scheduled".

69.     On August 11, 2020, Rosellini signed the Nexeon Stock Purchase Agreement (the "**Nexeon SPA**") for the sale of preferred stock from Rosellini, individually, to Zecevic or his entity,

Mina Mar Group ("**Mina Mar**"), which would become effective October 22, 2020.  SEC regulations require that this agreement be disclosed in a Form 8-K filing within 4 days, however Rosellini never filed the disclosure.  The Nexeon SPA would not be disclosed until November 27, 2020.

70.    Subsequently, Rosellini signed (via DocuSign) a "Board Resolution of Nexeon MedSystems, Inc." which was dated August 12, 2020 and adopted on Thursday, October 22, 2020" (the "**Rosellini Resignation Resolution**").  Under the Rosellini Resignation Resolution, the Board purportedly accepted the resignation of Rosellini as Executive Chairman and CEO, Christopher Miller as CFO, Kent J. George ("**George**") as Independent Director and Audit Committee Member, and Michael Neitzel ("**Neitzel**") as Independent Director, Audit Committee Member and Compensation Committee Member.  The other Board members, George and Neitzel, did not sign the Rosellini Resignation Resolution.

71.    On October 22, 2020, Rosellini signed (via DocuSign) a "Board Resolution of Nexeon MedSystems, Inc. Appointing Officers" appointing Miro Zecevic as President and CEO of Nexeon (the "**October 22, 2020 Board Resolution**").  The October 22, 2020 Board Resolution states that it was passed by the Board of Directors on August 12, 2020.  However, the October 22, 2020 Board Resolution is only signed by Rosellini.

72.    On November 27, 2020, Nexeon filed with SEC a Form 8-K signed by Zecevic as Chairman and CEO stating that "[o]n July 17, 2020, Miro Zecevic an individual and principal shareholder of Mina Mar Group, (the '**Purchaser**') personally acquired 100% of the issued and outstanding shares of preferred stock (the '**Preferred Stock**') of [Nexeon]" from William M. Rosellini (the 'Seller')," and that as a result of the purchase Zecevic "owns approximately 100% of the fully diluted outstanding equity securities of Nexeon and 100% of the voting rights for the

outstanding equity securities." Prior to this Form 8-K filing, neither Nexeon nor Rosellini had disclosed the issuance or existence of any preferred shares. The Nexeon SPA document was not publicly disclosed.

73.     On March 3, 2021, in post-judgment proceedings in the Nexeon Lawsuit to collect on the Agreed Judgment, Blischak obtained a court order ordering Nexeon to produce a copy of the Nexeon SPA, and any documents related to the issuance of preferred shares by Nexeon including, without limitation, legal opinions, board minutes or resolutions, and documents filed with the Nevada Secretary of State. Nexeon produced a copy of the Nexeon SPA, but produced few, if any, other documents. The Nexeon SPA mentions five attached Schedules including "Liens and Encumbrances," "Breaches, Defaults and Required Consents" and "Insider Indebtedness" schedules. Nexeon failed to provide any such schedules. Also, Nexeon failed to produce any documentation of the preferred shares. Furthermore, Zecevic claimed to have no documentation whatsoever for the preferred shares that were the basis for the Nexeon SPA.

74.     The Nexeon SPA states that Mina Mar, (not Zecevic as stated in the Form 8-K), purchased a block of 1,000,000 Series A Preferred shares (the "**Nexeon Control Block**") with 5000 voting rights per share, voting right equivalent to 5 billion common shares which, if valid, would give the holder 99.9% of the voting rights of Nexeon by diluting the approximately 2 million common shares.

75.     The Nexeon SPA also mentions a certain July 3, 2020 letter which proposed an arrangement under which Rosellini would work with Zecevic and/or Mina Mar to: (a) hand over control of Nexeon to Mina Mar (via the Nexeon Control Block); (b) use a Chapter 11 bankruptcy to eliminate Nexeon's creditors' claims; (c) reverse split to eliminate the common shareholders; (d) sell the company "shell" and net operating loss "NOL" for an estimated $400,000; and (e) split

the proceeds with Zecevic.  Under this arrangement, Rosellini would be enriched at the expense

of Nexeon's shareholder and creditors.  Zecevic wrote:

> "Here is the logic working the numbers backwards for the LOI.
> - When there are monies owed to lawyers and government the bankruptcy is not cheap. It will be about $100,000.
> - Company needs 2.5 years of audit. So this is another $65,000 to $75,000.
> - Reverse split and reorganization will be another $25,000.
> - All in our exposure is about $200,000
>
> Our proposal is as follows:
> - You hand over control of the NXNN company for $0 now.
> - We do all the aforementioned work. (logic working the numbers backwards)
> - Upon the completing of the whole process, we will market and sell the NXNN
> - We should be able to sell it for about $400,000 once it is all done and complete (please note that market conditions are constantly changing so we are not guaranteeing $400,000 but this is based on current market ask).
> - We would deduct our $200,000 expense from the sale price 1st
> - We would pay you your $82,000 that you initially asked for the Company
> - The balance of the monies of about $120,000 we would split with you on a 65% and 35% split.  You would receive the 35%."

The final version of the Nexeon SPA closely mirrored the terms proposed by Zecevic in the July

3, 2020 letter, except that Rosellini would now receive 37.5% of the gross proceeds, that is

$150,000, if the anticipated $400,000 Nexeon shell sales price was realized.

      76.     In a March 29, 2021 email exchange, Rosellini asked if Zecevic would be filing

Chapter 11 soon.  Zecevic responded stating that he would be unable to execute the scheme:

> "We were ready and locked to go for the chapter 11 and then this guy [Blischak] derail the whole process. He is making allegations of Fraud and once I told that to the trustee my fees went triple and then I had to supply him with all kinds of information that you gave me to satisfy him that there is no fraud.  That is one issue that I am dealing with now. The second issue is the fact that there is a gap in accounting with this company and you do not have books and Records to fill the gap. Sec has strange rules that the company has to be current before it can deregister. If we have a gap then we cannot do any corporate actions with finra. …
>
> Regarding this Brian individual I don't know what to tell you because the [MicroTransponder] shares [certificates] which you sent me are not endorsed on the back there's no Medallion stamp and none of those shares belong to nxnn. ?? How do those

shares belong to nxnn and how does nxnn own those shares? …I'm not gonna attend their April 9 court session their judgements will all wipe out with ch11."

77.     On April 7, 2021, Zecevic filed Form 15 "Certification and Notice of Termination of Registration under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports under Sections 13 and 15(d) of the Securities Exchange Act of 1934" with the SEC. The effect of this action was that Nexeon would no longer be required to file reports with the SEC, and Nexeon's shares would cease to be publicly traded.

78.     On April 8, 2021 Zecevic prepared the first draft of a Form 8-K filing announcing the recission of the Nexeon SPA, and instructed GlobalOne Filings Inc. ("**GlobalOne**") to make the "new co [Nexeon] address on the 8k (unless instructed differently by William [Rosellini]) 1910 Pacific Avenue, Suite 20000 Dallas TX 75201," and instructed GlobalOne to send the draft to Rosellini for review/finalization and then file it at the SEC under Rosellini's signature.  GlobalOne sent the draft Form 8-K to Rosellini.  Rosellini responded to GlobalOne with "here's the edited 8k and recission agreement signed."   Rosellini made two significant changes: (a) he deleted his [Rosellini's] name as the new Nexeon Chairman of the Board, leaving Nexeon with no directors or officers; and (b) changed Nexeon's address to 10 Jews Street, Ramsbury Site, Charlestown, Nevis (the same business address as RSH).   On information and belief Rosellini made these changes to impede Blischak's collection of the Agreed Judgment.

**K.     Rosellini deliberately misleads Blischak on Nexeon and its assets, including the MTI Stock.**

79.     On December 31, 2019, Nexeon's certificate of existence in the State of Nevada was revoked and has never been reinstated.   Under Nevada law, the corporation is deemed insolvent, and the corporation is not permitted to enter contracts, and all assets of the revoked corporation are to be held in trust by the board of directors:

NRS 78.175, "If the charter of a corporation is revoked and the right to transact business is forfeited as provided in subsection 2, all the property and assets of the defaulting domestic corporation must be held in trust by the directors of the corporation as for insolvent corporations, and the same proceedings may be had with respect thereto as are applicable to insolvent corporations."

80.     On March 1, 2020, after the forbearance period under the Agreed Judgment expired, Blischak scheduled a March 4, 2020 meeting with Rosellini to discuss payment of the Agreed Judgment.  On March 3, 2020, Rosellini declined the meeting stating:

> "I realized based on your texts that tomorrow you are probably going to be asking material, non-public information, while I like to give you an update, what you are asking for is illegal under a number of SEC regulations.  Sorry."

By this statement, Rosellini admittedly had knowledge of his obligation to make required SEC disclosure filings – which he was not causing Nexeon to file – but was attempting to use his violation of SEC regulations to conceal information to impede Blischak's collection of the Agreed Judgment.

81.     On March 13, 2020, Rosellini forwarded to Blischak a February 27, 2020 email from Rosellini to OIG counsel Michael Torrisi in which Rosellini stated "Nexeon will likely be filing chapter 7."  Rosellini represented to the OIG that neither he nor Nexeon had sufficient assets to pay the United States Government's claims against them, thereby attempting to influence the OIG to assess a smaller fine against Nexeon and Rosellini.  Rosellini forwarded this email to Blischak for the same purpose, to discourage, if not prevent, Blischak from collecting on the Agreed Judgment.

82.     On April 23, 2020, Rosellini sent an email to Blischak stating that he was winding down Nexeon himself and that there were no assets other than some patents and the MTI Stock. Rosellini stated that he needed to order a valuation or sell these assets.  Rosellini did not disclose

to Blischak that the MTI Stock had never been transferred to Nexeon.  Rosellini asked Blischak to make an offer to resolve the Agreed Judgment.

83.    On May 19, 2020, in response, Blischak suggested that Nexeon transfer the MTI Stock to Blischak to satisfy the Agreed Judgment.  On May 24, 2020, Rosellini responded that "[t]here are senior secured notes above your debt and there is no market for the Microtransponder [sic] until the [MicroTransponder clinical] study completes which should happen in July." Blischak then asked Rosellini to send the list of creditors and amounts owed.  Rosellini failed to do so.

84.    On May 27, 2020, in an email to Rosellini, Blischak asked if Nexeon could satisfy the Agreed Judgment by Blischak selling the MTI Stock on Nexeon's behalf.  In response, Rosellini again confirmed that Nexeon had the MTI Stock:

> "The MTI shares will only be worth something when [MicroTransponder's] clinical study finishes, so I would wait until they announce their data to try to sell them"

85.    On July 3, 2020, Zecevic, on behalf of Mina Mar, delivered a letter to Rosellini related to a "LOI Proposal for Consulting Service in Sale process of NXNN."  In that July 3, 2020 letter, Zecevic stated that he discovered Nexeon owed a "substantial amount of money to the government."  Zecevic provided his "logic working the numbers backwards for the LOI."  Zecevic and Mina Mar offered that, if Rosellini would "handover control of NXNN company for $0 now," then Mina Mar would perform work to put Nexeon through a Chapter 11 filing at an estimated cost of $200,000.  Mina Mar would pay Rosellini $82,000 plus 35% of other funds after deducting Mina Mar's costs of $200,000.  Again, as this deal with Zecevic moved forward, it was clear Rosellini was putting his personal interests before Nexeon's creditors.

86.    On August 5, 2020, Rosellini sent an email to Blischak offering to settle Blischak's Agreed Judgment by transferring stock in another company, Nuviant, to Blischak.  In that same

email, Rosellini confirmed that Nexeon had the MTI Stock and stated that there was approximately

$100,000 in secured claims.  Rosellini gave Blischak excuses for refusing the deliver the MTI

Stock to Blischak to satisfy the Agreed Judgment:

> "That would leave Ryan Sefkow, Dan Powell, Navid, Melanie with salary claims
> on Nexeon US (totally about $200k).  I am holding back the Microtransponder
> stock to pay their claims.  Also, if I include that stock in the deal, there will be
> nothing left in the company and the bankruptcy court could claw it back.  Lastly,
> there is an issue with how I transferred the stock in Microtransponder to Nexeon,
> so there is a very real possibility that based on the MTI shareholder agreement this
> wouldn't be a valid claim unless I sell the stock individually and then pass the cash
> to Nexeon (unless in a bankruptcy judge forced it)."

Rosellini then told Blischak he had a deal with Zecevic and Mina Mar:

> "If that doesn't work then I have received an offer from Miramar [sic] Group, which
> will enable me to sell Nexeon for a cash fee, they will chapter 11 the company and
> then work to get it current again and reporting.  If they do that, your unsecured
> claim will be behind ~$100K of secured claims and ~1M in unsecured claims."

87.     On or about August 5, 2020, Rosellini and/or Zecevic created a document entitled

Stock Purchase Agreement that is dated August 11, 2020 (the aforementioned Nexeon SPA).

Under the Nexeon SPA, Rosellini purported to sell to Mina Mar Group, Corp., a Florida

corporation, the "Control Block" as that term is defined in the Nexeon SPA, purportedly consisting

of "Common Stock – 75,000,000 authorized, 2,035,952 outstanding, no par value, 1-1 voting

rights" and "Series A Preferred Stock – 1,000,000 authorized and outstanding, 0.001 par value,

5000-1 super voting rights, with conversion rights to common stock."  However, Nexeon had not

issued any preferred stock.  In return, Mina Mar agreed to pay "$1.00 on closing" and "37.5% of

the retail sales price after Ch. 11 finalized and new buyer located for the control block."

88.     On September 15, 2020, Rosellini signed both the OIG Settlement Agreement and

HHS Voluntary Debarment Agreement.  On October 13, 2020, OIG and HHS respectively counter-

signed the OIG Settlement Agreement and HHS Voluntary Debarment Agreement and announced

the settlement on their website.  It appears that Rosellini was waiting for the resolution of the OIG Fraud Investigation before completing the Nexeon SPA.

89.    On November 4, 2020, in an email exchange in which Blischak asked about Nexeon's assets, Rosellini stated "nothing left, preferred debt did a sweep on all assets."  In response to Blischak's inquiry as to specifically who swept the assets, Rosellini answered "Leonite and FirstFire Capital."  Blischak asked whether they took the MTI Stock, Rosellini answer "Yes." After Blischak requested a copy of the documents under which they took the MTI Stock, Rosellini responded "Bankruptcy is being prepared now will make sure you know when filed."  Rosellini's statement is a demonstrable lie which Rosellini made knowingly, and again hindered, delayed and defrauded Blischak in his efforts to collect the Agreed Judgment.

90.    On November 27, 2020, Nexeon filed a Form 8-K signed by Zecevic as Nexeon Chairman and CEO.  In the November 27, 2020 Form 8-K, Nexeon stated that, "[o]n July 17, 2020, Miro Zecevic an individual and principal shareholder of Mina Mar Group, (the 'Purchaser') personally acquired 100% of the issued and outstanding shares of preferred stock (the 'Preferred Stock') of [Nexeon]" from William M. Rosellini (the 'Seller')."

91.    On February 11, 2021, after Blischak filed a motion to compel post-judgment discovery in attempt to collect the Agreed Judgment, Rosellini sent an email to Zecevic's assistant, Irene Black, who forwarded the email to Blischak on February 12, 2021.  In the email, Rosellini produced a scan of an agreement under which Rosellini first claimed to have purchased the MTI Stock from Nexeon (the aforementioned FirstFire Repayment Agreement); and (ii) a ZIP file containing some of the documents related to entry into the FirstFire SPA—neither of which had previously been disclosed.  Rosellini stated:

> "After reading what [Blischak] sent, this is the Microtransponder stock he is
> referring [to]. I agreed to pay a secured note (which is over the judgement held by

Brian [Blischak]) on behalf of Nexeon in exchange for the Microtransponder stock."

92.    On March 3, 2021, Blischak obtained a court order in the Nexeon Lawsuit for Nexeon to produce all communication related to, and the original hand-signed FirstFire Repayment Agreement.  Nexeon failed to produce the original FirstFire Repayment Agreement.

93.    On March 8, 2021, Rosellini sent an email to Blischak and Zecevic stating that "I am going to rescind the debt exchange agreement [FirstFire Repayment Agreement] with Nexeon in its entirety, so Nexeon would now hold 267 shares of MicroTransponder stock."  Rosellini attached to that email a signed document entitled "Mutual Rescission and Release Agreement," purportedly effective as of August 11, 2020, through which Rosellini purported to rescind the FirstFire Repayment Agreement.  The preamble stated that the parties to this Mutual Rescission and Release Agreement were Nexeon and Rosellini, individually, but both signature lines were (nonsensically) for Rosellini and Rosellini signed this Mutual Rescission and Release Agreement twice on behalf of himself making the document meaningless.  Again, Rosellini hindered, delayed and defrauded Blischak in his attempts to collect the Agreed Judgment.

94.    On March 9, 2021, and again on March 10, 2021, Blischak asked Rosellini via email to revise his Mutual Rescission and Release Agreement so that the entities match those on the FirstFire Repayment Agreement, and have Zecevic sign it on behalf of Nexeon.  On March 10, 2021 Blischak asked Zecevic, "Will you sign an agreement to return the Microtransponder shares to Nexeon?"  Zecevic responded the same day, "Yes, I'll sign the agreement to return the Microtransponder shares to Nexeon."  However, Zecevic did not do so.

95.    On April 6, 2021, Zecevic sent Blischak a copy of a March 29, 2021 email exchange with Rosellini in which Zecevic questioned Rosellini on how Nexeon could rescind the FirstFire Repayment Agreement when Nexeon did not own the MTI Stock,

"Regarding this Brian individual I don't know what to tell you because the [MicroTransponder] shares [certificates] which you sent me are not endorsed on the back there's no Medallion stamp and none of those shares belong to nxnn. ?? How do those shares belong to nxnn [Nexeon] and how does nxnn own those shares?"

96.    On April 7, 2021, Blischak received a copy of the purported certificates for the MTI Stock for the first time through an email from Zecevic. The MTI Stock certificates state that 166 shares of MTI Stock are held in the name of Rosellini and 100 shares of MTI Stock are held in the name of The Picus Trust Group. However, the certificates produced by Rosellini apparently do not match MTI's stock ledger records. Again, Rosellini hindered, delayed and defrauded Blischak in his attempts to collect the Agreed Judgment, this time by attempting to fraudulently induce Blischak to sign an agreement to exchange his claims under the Agreed Judgment plus a covenant not to sue Rosellini for (worthless, invalid stock certificates.

97.    On April 8, 2021, Rosellini, as President of RSH, and Zecevic, as President of Mina Mar, signed a document entitled "OTC:NXNN Agreement to Rescind Contract of Sale" (the "**Rescission Agreement**"), purportedly rescinding the Nexeon SPA and returning the Nexeon Control Block to Rosellini, but the document includes no language rescinding any agreement. Further, Rosellini apparently forgot that he signed the Nexeon SPA in his individual capacity.

98.    Also on April 8, 2021, Rosellini purported to donate his entire personal holdings of Nexeon shares to the Cancer Prevention and Research Institute of Texas. Rosellini valued the 1.1 million shares at $781,000. Rosellini did not mention what happened to the Nexeon Control Block of 1 million Series A Preferred shares with 5000 voting rights per share that he purportedly acquired under the Recission Agreement.

99.    On April 9, 2021, Rosellini signed a Form 8-K on behalf of Nexeon in an undefined role and filed this Form 8-K with the SEC, thereby disclosing that (a) Nexeon changed its address to 10 Jews Street, Ramsbury Site, Charlestown, Nevis (which happens to be the same business

address for RSH); and (b) the Nexeon SPA had been rescinded (which was illogical because Rosellini (individually) purportedly sold the shares to Zecevic, not Nexeon, and the agreement was rescinded by RSH); and (iii) Zecevic resigned as Chairman and CEO leaving Nexeon with no officers or directors.

100.    On May 18, 2021, in a post-judgment hearing in the Nexeon Lawsuit, Rosellini testified under oath that: (a) he had no knowledge of the April 8, 2021 Form 8-K filing, then after being presented with a copy of the Form 8-K with his electronic signature, Rosellini claimed that he had no role in its drafting and stated that Zecevic had used Rosellini's electronic signature; and (b) he was unaware that Nexeon's headquarters had been moved to Nevis (which coincidentally was identical to the address for RSH). However, an April 8, 2021 email shows that, not only was Rosellini aware of the Form 8-K filing, but that Rosellini finalized the draft by: (i) removing a statement that Rosellini would become Chairman and CEO; (ii) changing the address for Nexeon from Texas to Nevis; and (iii) giving the final authorization for GlobalOne to submit the filing under his signature.

101.    On May 24, 2021, the Court in the Nexeon Lawsuit signed an Order Granting Judgment-Creditor's Application for Turnover Order in which all causes of action owned by Nexeon against Rosellini and his affiliates were turned over to the Constable of Dallas County, Texas for sale at public auction. The auction was scheduled for August 30, 2021.

102.    On August 29, 2021, Rosellini emailed Blischak threatening to hinder collection by moving Rosellini's residency, and exhausting the assets involved in the complaint beyond the reach of the court to delay Blischak's ultimate collection under any suit:

> "If you continue and file … In 2 years if you win a judgement 50/50 (your odds, I think it is less than 1% chance), then win an appeal a year later, you will need to relitigate in the jurisdiction I live, then relitigate where the assets are, if there are any which there won't be since I will spend all of my money on litigation. If I lose

all of the above, then my wife likely divorces me and I am forced to file for bankruptcy."

103.    On August 30, 2021, Blischak purchased any and all causes of action that Nexeon has or had against Rosellini and his affiliates. Consequently, Blischak is the assignee of any and all causes of action that Nexeon has or had against Rosellini and his affiliates and is the party in interest to pursue any such claims.

## IV. CAUSES OF ACTION

104.    All of the foregoing paragraphs are incorporated by reference into each cause of action, and all facts and causes of action are pled in the alternative, as well as a whole, and apply to all Defendants unless specifically limited hereafter.

## A.    Count 1 – Fraud (FirstFire Repayment Agreement).

105.    The FirstFire Repayment Agreement was fraudulent because it was based on the FirstFire SPA, which was fraudulently entered into because: (i) Rosellini issued Nexeon shares and rights without Board approval in violation of Nevada law; (ii) Rosellini directed the proceeds of the FirstFire SPA to NMB and, consequently, Nexeon received no consideration; and (iii) the FirstFire SPA, signed concurrently with the Bionics Agreement and the Bobbaers Agreement, was part of a scheme to transfer assets to NMB immediately before transferring the NMB stock (through Nuviant and RSH) to Rosellini personally. Further, Rosellini concealed his actions surrounding the FirstFire SPA by: (a) failing to make required SEC disclosures; (b) failing to disclose the NMB stock transfer on the Nexeon OIG Disclosure or subsequent updates or his personal OIG disclosure; and (c) providing Blischak with a false document (blank disbursement instructions) in order to hinder and delay collection of Agreed Judgment.

106.    The FirstFire Repayment Agreement was also fraudulent because (i) even if the FirstFire SPA had been valid, Nexeon received zero new consideration for entering the FirstFire

Repayment Agreement because Rosellini had previously personally guaranteed the FirstFire debt when the FirstFire SPA was signed; (ii) Nexeon's corporate charter was revoked at the time the FirstFire Repayment Agreement was purportedly signed and, consequently, under Nevada law: (a) Rosellini lacked authority to sign the FirstFire Repayment Agreement in his role as CEO; and (b) the agreement was illegal under Nevada law which requires that proceeds are paid first to Nevada SOS and then to creditors as for an insolvent firm; and (iii) to advance his self-interests, Rosellini represented, on behalf of Nexeon, that the agreement did not violate any other agreements when Rosellini knew that it violated (a) the MicroTransponder Shareholders Agreement which required that the MTI Stock be offered to MTI and its shareholders before Rosellini could acquire it, and (b) the FirstFire Security Agreement under which the MTI Stock had been purportedly pledged.

107.    As a result of Rosellini's fraud, Nexeon received zero consideration and the FirstFire Repayment Agreement is voidable, and Plaintiff sues to void the FirstFire Repayment Agreement and the transfer of any MTI Stock to Rosellini from Nexeon.

**B.    Count 2 - Breach of Contract (FirstFire Repayment Agreement).**

108.    Pleading in the alternative, the FirstFire Repayment Agreement is voidable because Rosellini gave no consideration for his agreement to pay FirstFire.  Rosellini had personally guaranteed Nexeon's obligation to pay FirstFire.  Consequently, Blischak, as assignee of Nexeon, seeks rescission of the FirstFire Repayment Agreement and recovery of the MTI Stock by Plaintiff.

**C.    Count 3 - Fraudulent Transfer of MTI Stock (FirstFire Repayment Agreement).**

109.    Pleading in the alternative, to the extent Nexeon owned the MTI Stock, the transfer of MTI Stock to Rosellini was a fraudulent transfer.

110.    Pursuant to Texas Business and Commerce Code 24.001 *et seq*., the transfer of MTI Stock to Rosellini pursuant to the FirstFire Repayment Agreement was made, or the obligations incurred, by Nexeon with actual intent to hinder, delay, or defraud entities to which Nexeon was or became, on or after the date that transfer was made or such obligations incurred, indebted.

111.    Alternatively, Nexeon received less than a reasonably equivalent value in exchange for the transfer of the MTI Stock pursuant to the FirstFire Repayment Agreement; and Nexeon was engaged in business or a transaction, or was about to engage in business or a transaction, for which the remaining assets of Nexeon were unreasonably small in relation to the business or transaction, or

112.    Alternatively, Nexeon made the transfer of the MTI Stock pursuant to the FirstFire Repayment Agreement:

(a)    without receiving a reasonably equivalent value in exchange for the transfer of the MTI Stock pursuant to the FirstFire Repayment Agreement, and Nexeon was insolvent at that time or Nexeon became insolvent as a result of the transfer of the MTI Stock pursuant to the FirstFire Repayment Agreement; or

(b)    to an insider for an antecedent debt at a time when Nexeon was insolvent, and the insider had reasonable cause to believe that Nexeon was insolvent.

113.    Plaintiffs will show that numerous "badges" of fraud are present to avoid the fraudulent transfer:

a.   The transfer was to an insider, namely Rosellini.

b.   The debtor retained possession or control of the property transferred after the transfer.

c.   The transfer or obligation was concealed.  Rosellini was required to disclose the transfer of the MTI Stock:  (i) under the terms of the MicroTransponder

Shareholder Agreement, Rosellini was obligated to disclose and offer the shares to MTI for cash consideration; (ii) under SEC rules because the MTI Stock was a material asset; (iii) as part of Nexeon's OIG Disclosure, or any update thereto, under penalty of perjury Rosellini was obligated to disclose any asset transfer and the purported MTI Stock transfer was not disclosed (and Nexeon continued to list the FirstFire debt among its obligation on July 5, 2020); and (iv) as part of Rosellini's personal OIG Disclosure, or any update thereto, under penalty of perjury Rosellini was obligated to disclose all assets and any asset transfer (OIG would have been particularly interested to know if Rosellini had $100,000 to buy MTI Stock while claiming that he was unable to pay OIG's fines). Additionally, Rosellini signed the FirstFire Repayment Agreement by hand rather than his typical signature by DocuSign.  Further, the PDF of the FirstFire Repayment Agreement was created on September 15, 2020 – nine months after the purported date of that agreement.  Additionally, on multiple occasions after January 15, 2020 Rosellini told Blischak that Nexeon held the MTI Stock and first revealed the purported FirstFire Repayment Agreement in February 2021. The court in the Blischak lawsuit ordered Nexeon to produce the original version of the FirstFire Repayment Agreement, but Nexeon (and Rosellini) has failed to do so to date.

d.  Before the transfer was made or obligation was incurred, Nexeon had been sued, and the Agreed Judgment was entered against Nexeon in favor of Blischak.

e.   The transfer was of substantially all of the debtor's assets, as detailed by Rosellini in the OIG Disclosure signed on January 15, 2020 (the same date as purported date of the transfer).

f.   The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred.  Furthermore, Rosellini back-dated the FirstFire Repayment Agreement from September 2020 to January 2020 because the MTI Stock value increased substantially in July 2020 after the company successfully completed its VNS-Rehab clinical study.

g.   Nexeon was insolvent before the transfer was made, as evidenced by among other things the financial information in the OIG Disclosure signed by Rosellini.

114.    By reason of the foregoing, Plaintiff sues to avoid the transfer of the MTI Stock pursuant to the FirstFire Repayment Agreement to Rosellini and/or RSH, and to recover the MTI stock or the value thereof from Rosellini and/or RSH pursuant to Tex. Bus. & Com. Code 24.001 *et seq*.

## D.    Count 4 - Fraudulent Transfer (MTI Contribution Agreement and MTI Stock Exchange Agreement).

115.    Pursuant to Texas Business and Commerce Code 24.001 *et seq*., the transfers of Nexeon stock and assets to Rosellini or his affiliated entities, under the MTI Contribution Agreement and the MTI Stock Exchange Agreement, were made or obligations incurred by Nexeon with actual intent to hinder, delay, or defraud entities to which Nexeon was or became, on or after the date that the Transfer was made or such obligations incurred, indebted.

116.    Alternatively, Nexeon received less than a reasonably equivalent value in exchange for such transfers made or such obligations incurred; and

(a)    Nexeon was engaged in business or a transaction, or was about to engage in business or a transaction, for which the remaining assets of Nexeon were unreasonably small in relation to the business or transaction, or

(b)    Nexeon intended to incur, or believed or reasonably should have believed that Nexeon would incur, debts that would be beyond Nexeon's ability to pay as such debts became due.

117.    Alternatively, Nexeon made the transfer or incurred the obligation:

(a)    without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Nexeon was insolvent at that time or Nexeon became insolvent as a result of the transfer or obligation; or

(b)    to an insider for an antecedent debt at a time when Nexeon was insolvent, and the insider had reasonable cause to believe that Nexeon was insolvent.

118.    By reason of the foregoing, Plaintiff sues to avoid the transfer made to Rosellini and/or RS or obligations incurred, and to recover the MTI stock, or the value thereof, from the Rosellini and/or RS pursuant to Tex. Bus. & Com. Code 24.001 *et seq.*

**E.    Count 5 – Statutory Fraud under Chapter 27 of the Tex. Bus. & Com. Code (MTI Contribution Agreement and MTI Stock Exchange Agreement).**

119.    Plaintiff further alleges that Defendant is liable for statutory fraud pursuant to Chapter 27 of the Tex. Bus. & Com. Code.  Rosellini made false representations of a part or existing material fact, that Rosellini and RS had authority to transfer the MTI Stock to Nexeon and that Rosellini and RS would do so in exchange for other consideration.  Rosellini and RS made such representation to Nexeon for the purpose of inducing Nexeon into the MTI Contribution Agreement and MTI Stock Exchange Agreement and Nexeon relied on Rosellini by entering into those contracts.

120.     Additionally, Rosellini made a false promise to transfer the MTI Stock which was a material promise made with the intention of not fulfilling it.  Rosellini made the false promise to Nexeon for the purpose of inducing Nexeon: (a) to issue Nexeon stock to Rosellini and RS under the MTI Contribution Agreement, and (b) to transfer Emeritus stock under the MTI Stock Exchange Agreement, and Nexeon relied on Rosellini in entering into those contracts.

121.     Further, Rosellini and RS made the false representations or false promises with actual awareness of the falsity thereof.  In addition to any inferences, Rosellini and RS never sought authorization from MicroTransponder to transfer the MTI Stock.  Rosellini and RS never took any action to put the MTI Stock into the name of Nexeon.

122.     Consequently, as assignee of Nexeon's claims against Rosellini and his affiliates, Blischak requests that the Court order Rosellini to transfer the MTI Stock to Blischak.

123.     Consequently, Rosellini and RS are additionally liable for exemplary damages pursuant to Tex. Bus. & Com. Code § 27.01(c).  Additionally, Plaintiff seeks the benefit of the bargain, reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court pursuant to Tex. Bus. & Com. Code § 27.01(e).

**F.     Count 6 - Breach of Fiduciary Duty.**

124.     Rosellini, the actual or de facto Chairman and Chief Executive Officer of Nexeon, had a fiduciary duty to Nexeon and its creditors, including duties of care and loyalty, and the obligation of good faith and to comply with the terms of Nexeon's Bylaws or company agreement and applicable law.

125.     Rosellini breached his fiduciary duty by, among other things, refusing and failing to perform his obligations by violating the Bylaws, causing Nexeon to transfer assets for little or no consideration, causing Nexeon to enter into debt-repayment obligations that caused Nexeon to

incur usurious interest, causing Nexeon to pay usurious interest to creditors, causing Nexeon to incur additional debts that it could not repay when it was insolvent, entering into insider transactions without disclosure or Board approval, entering into transactions for the benefit of family members to the detriment of Nexeon, and by failing to put the interests of Nexeon ahead of his own interests, each of which individually, or any combination thereof violate, among other acts and omissions, Rosellini's duties of care and loyalty and his obligation of good faith.

126.    Rosellini breached his fiduciary duty by causing Nexeon to enter into the MTI Contribution Agreement and, thereby, failing to ensure that Nexeon received a reasonably equivalent value in exchange for Nexeon's stock and assets.

127.    Rosellini breached his fiduciary duty by causing Nexeon to enter into the MTI Stock Exchange Agreement and, thereby, failing to ensure that Nexeon received a reasonably equivalent value in exchange for Nexeon's assets.

128.    Rosellini breached his fiduciary duty by execution of the MTI Stock Exchange Agreement resulting in self-dealing for his financial benefit related to the ownership of the Emeritus stock.

129.    Rosellini breached his fiduciary duty to Nexeon by causing Nexeon to enter into the Leonite SPA and Leonite Note in which Nexeon agreed to pay, and paid, a criminally usurious amount of interest under New York law.  Rosellini breached his fiduciary duty by causing Nexeon to breach the Leonite SPA by failing to provide fully executed transfer agent instructions when switching to Equity Stock Transfer LLC.  Rosellini breached his fiduciary duty to Nexeon by failing to assert that the Leonite SPA and Leonite Note were usurious including the negotiation and execution of the First Leonite Forbearance Agreement, the Second Leonite Forbearance Agreement, and the Second Amended Leonite Note.

130.     Rosellini breached his fiduciary duty by negotiating the resolution of Nexeon's debt for the purpose of protecting his Father, from his guaranty of Nexeon debt, including the negotiation and execution of the First Leonite Forbearance Agreement, the Second Leonite Forbearance Agreement, and the Second Amended Leonite Note, after granting Father an interest in Nexeon for this guaranty.

131.     Rosellini breached his fiduciary duty by self-dealing by causing Nexeon and NMB to enter into the Bobbaers Agreement under which NMB's assets, including the Synapse Device and €400,000 MediLine Sale Earnouts were transferred to RSH for zero consideration.

132.     Rosellini breached his fiduciary duty by causing Nexeon to enter into the FirstFire Note without board approval when Nexeon was insolvent and pledged all of Nexeon's assets. Rosellini breached his fiduciary duty to Nexeon by causing funds from the FirstFire SPA and FirstFire Note to be disbursed to NMB rather than to Nexeon. Rosellini breached his fiduciary duty by causing funds from the FirstFire SPA to be used for the Synapse Device after it was transferred to RSH.

133.     Rosellini breached his fiduciary duty to Nexeon by causing Nexeon to enter into the FirstFire Repayment Agreement without board approval. Rosellini breached his fiduciary duty by self-dealing by entering into the FirstFire Repayment Agreement under which he would purportedly receive the MTI Stock for paying Nexeon's debt at a time when Rosellini was already guarantor of the debt purportedly owed to FirstFire.

134.     Rosellini breached his fiduciary duty to Nexeon by causing Nexeon to take actions leading to the OIG Fraud Investigation, the OIG Settlement Agreement, and the HHS Voluntary Debarment Agreement.

135.    Rosellini breached his fiduciary duty by issuing preferred shares to himself for no consideration and/or representing that he possessed such shares in SEC filings when no such preferred stock was authorized.

136.    Rosellini breached his fiduciary duty to Nexeon by his self-dealing in entering into the Nexeon SPA in which Rosellini would transfer the purported preferred stock of Nexeon to Zecevic or Mina Mar, who would then put Nexeon through a chapter 11 bankruptcy process and, in return, Rosellini would financially benefit to the detriment of Blischak and Nexeon's creditors.

137.    Rosellini breached his fiduciary duty to Nexeon by failing to cause funds received from HHS to be used for their intended purpose.

138.    Rosellini breached his fiduciary duty to Nexeon by causing Nexeon to hire Emily, his wife, though she did no work for Nexeon such that she was paid by a Nexeon subsidiary allowing Rosellini to claim that he was taking no salary, and to evade US income taxes by recharacterizing his US-sourced income as her Puerto Rico income subject to significantly lower tax rates.

139.    Rosellini breached his fiduciary duty of loyalty to Nexeon when he resigned as CEO and Chairman, and used the voting rights of the preferred stock of Nexeon (which he knew to be invalid and non-existent) to appoint Zecevic as his replacement for Chairman of the Board in furtherance of the Nexeon SPA scheme, and with actual intent to hinder, delay Blischak's collection of the Agreed Judgment.

140.    Rosellini breached his fiduciary duty to Nexeon by failing to cause Nexeon to file required disclosures with the SEC.

141.    Rosellini breached his fiduciary duty to Nexeon by filing disclosures with the SEC which Rosellini knew to be untrue, specifically a November 27, 2020 Form 8-K which disclosed the sale of the non-existent preferred stock of Nexeon.

142.    By reason thereof, Plaintiff is entitled to recover damages within the jurisdictional limits of this Court.

**G.    Count 7 – Nexeon's Claim for Fraud and Fraudulent Inducement.**

143.    Plaintiff, as assignee of Nexeon, alleges that Defendants are liable for fraud and fraudulent inducement for numerous acts or omissions as set forth herein.

144.    In entering into the MTI Contribution Agreement, Rosellini misrepresented to Nexeon that RS and/or its wholly owned subsidiary Belltower owned 167 shares of MTI Stock. In fact, neither RS nor Belltower have ever owned any MTI Stock.

145.    In entering into the MTI Contribution Agreement, Rosellini misrepresented to Nexeon that Rosellini or his affiliated entities had authority to transfer the MTI Stock to Nexeon. Pursuant to the MicroTransponder Amended and Restated Shareholders' Agreement, Rosellini was required to get authorization to transfer the MTI Stock.  Rosellini never sought authorization from MicroTransponder to transfer the MTI Stock and had no intent to transfer the MTI Stock to Nexeon.

146.    In entering into the MTI Contribution Agreement, Rosellini misrepresented to Nexeon that Rosellini or his affiliated entities would transfer the MicroTransponder Stock to Nexeon.  Rosellini never delivered, or caused his affiliated entities to deliver, the MTI Stock to Nexeon.

147.    In entering into the MTI Stock Exchange Agreement, Rosellini misrepresented to Nexeon that RS owned 100 shares of MTI Stock.  In fact, RS has never owned any MTI Stock.

148.     In entering into the MTI Stock Exchange Agreement, Rosellini misrepresented to Nexeon that Rosellini or his affiliated entities had authority to transfer the MTI Stock to Nexeon. Pursuant to the MicroTransponder Amended and Restated Shareholders' Agreement, Rosellini was required to get authorization to transfer the MTI Stock. Rosellini never sought authorization from MicroTransponder to transfer the MTI Stock and had no intent to transfer the MTI Stock to Nexeon.

149.     In entering into the MTI Stock Exchange Agreement, Rosellini misrepresented to Nexeon that Rosellini or his affiliated entities would transfer the MicroTransponder Stock to Nexeon. Rosellini never delivered, or caused his affiliated entities to deliver, the MTI Stock to Nexeon.

150.     In entering into the FirstFire Repayment Agreement, Rosellini back-dated the agreement from September 15, 2020 to January 15, 2020 when the value of the MTI Stock was lower.

151.     In entering into the FirstFire Repayment Agreement, Rosellini fraudulently represented that he had previously loaned $50,311 in order to justify that he was paying fair market value for the MTI Stock.

152.     Defendant's representations were material to Nexeon's decision to transfer Nexeon and Emeritus stock to Rosellini and RS. In reliance on Rosellini's representation, Nexeon performed and transferred Nexeon and Emeritus stock to Rosellini and RS. Defendant knew his representations to Nexeon were false at the time that he made the representation because he had no actual intent to transfer the MTI Stock to Nexeon, and had not even sought authorization from MicroTransponder to transfer the MTI Stock to Nexeon.

153.    In the alternative, Rosellini made the representation recklessly to Nexeon that he or his affiliates would transfer the MTI Stock to Nexeon.  Defendant did not intend to transfer the MTI Stock to Nexeon because Rosellini never sought authorization from MicroTransponder to transfer the MTI Stock.

154.    By reason thereof, Plaintiff is entitled to recover damages within the jurisdictional limits of this Court.

## H.    Count 8 – Blischak' s Claim for Fraud and Fraudulent Inducement.

155.    Blischak alleges that Defendants are liable for fraud and fraudulent inducement for numerous acts or omissions as set forth herein.

156.    Rosellini engaged in a course of conduct to defraud Blischak from collecting on the Agreed Judgment.  Rosellini repeatedly gave Blischak false information in relation to the status and assets of Nexeon.  Rosellini's sole purpose was to defraud Blischak to prevent him from collecting the Agreed Judgment.

157.    Rosellini had an obligation to inform Blischak, other creditors and the SEC that he had not caused the transfer of the MTI Stock to Nexeon.  To the contrary, Rosellini concealed the fact that he had not caused the transfer of the MTI Stock to Nexeon.

158.    Rosellini defrauded Blischak by non-disclosure by failing to cause Nexeon to file required disclosures with the SEC in violation of SEC regulations thereby preventing him from collecting the Agreed Judgment.

159.    Rosellini defrauded Blischak from collecting the Agreed Judgment by representing that Nexeon was filing for bankruptcy.

160.    Rosellini defrauded Blischak by purportedly transferring his entire holding of Nexeon stock to the Cancer Prevention and Research Institute of Texas, thereby leaving Nexeon without any officers, directors or shareholders that could appoint new replacements.

161.    Rosellini defrauded Blischak from collecting the Agreed Judgment by making representations that Nexeon held the MTI Stock, but that: (a) such stock was subject to security interests; (b) there was no market for such stock until after MTI's study finished in July 2020; and that (c) lienholders Leonite and FirstFire had foreclosed on the asset, but refusing to provide documents purportedly supporting Rosellini's representations.

162.    Rosellini defrauded Blischak from collecting the Agreed Judgment by Rosellini's various misrepresentations regarding the ownership of the MTI Stock.

163.    Rosellini defrauded Blischak from collecting the Agreed Judgment by Rosellini's representations and acts related to his affiliated entities' transfer of interest in Nexeon to and from Zecevic and Mina Mar.  Further, Rosellini defrauded Blischak by failing to file required disclosures with the SEC related to Rosellini's or his affiliated entities' purported transfer of Nexeon stock to Zecevic and Mina Mar.

164.    Rosellini defrauded Blischak from collecting the Agreed Judgment by conferring and conspiring with Leonite, and encouraging Leonite to claim, to have a security interest in Nexeon's assets.

165.    Rosellini hindered, delayed and defrauded Blischak from collecting the Agreed Judgment by testifying falsely in post-judgment hearings in the Nexeon Lawsuit.

166.    Rosellini hindered, delayed and defrauded Blischak from collecting the Agreed Judgment by delivering false documents.

167.    Rosellini hindered, delayed and defrauded Blischak from collecting the Agreed Judgment by fabricating the purported FirstFire Repayment Agreement, signing that agreement by hand (rather than DocuSign), and backdating that agreement.

168.    Rosellini hindered, delayed and defrauded Blischak from collecting the Agreed Judgment by entering FirstFire SPA when Nexeon was insolvent reducing the priority of Blischak's claim and by incurring additional senior debt that Nexeon could not repay or debt that properly belonged to NMB, or was used for RSH's benefit.

169.    Rosellini hindered, delayed and defrauded Blischak from collecting the Agreed Judgment by sending Blischak a Disbursement Authorization related to the FirstFire Note with the "Schedule A" wiring instructions blank.

170.    Rosellini hindered, delayed and defrauded Blischak from collecting the Agreed Judgment by moving Nexeon's principal place of business to Nevis.

171.    Blischak relied upon Rosellini's representations to his substantial injury and damage.  By reason of Blischak's reliance on Rosellini's representations of material facts, Blischak has been damaged within the jurisdictional limits of this Court.  Blischak sues to recover any and all such damages.

**I.    Count 9 – Ultra Vires.**

172.    Article III, Section 2 of the By-Laws provides that the business and affairs of Nexeon shall be carried on by or under the direction of the Board of Directors.  Subject to the terms of the Certificate of Incorporation, a quorum shall be a majority of the Directors then in office, but not less than three (3) Directors unless a Board of less than three (3) Directors is authorized by the Nevada Revised Statutes.

173.    At a time when Nexeon was insolvent, Rosellini unilaterally executed a Board Consent for Nexeon to borrow up to $250,000 from FirstFire.

174.    Rosellini entered into the FirstFire Note without a majority vote of the Board, in violation of the By-Laws, and, because the FirstFire SPA included the issuance of share rights, in violation of Nevada law.

175.    Further, Rosellini's drafting and execution of the FirstFire Repayment Agreement was *ultra vires*.

176.    Defendant's wrongful conduct, namely his refusal to cause Nexeon to pay Plaintiff, while incurring additional debt at a time when Nexeon was insolvent, thereby caused Plaintiff to suffer economic damages, and harming Nexeon's creditors.

**J.    Count 10 – Alter Ego Liability.**

177.    Plaintiff further alleges that Rosellini is jointly and severally liable for the wrongful conduct of Nexeon because Nexeon is the alter ego of Rosellini.  In support of this claim, Plaintiff will show that: (1) Rosellini was the largest shareholder of Nexeon during the majority of the events that occurred as stated herein and, more recently, was the sole shareholder of Nexeon- or represented himself as holding 99.9% of the voting rights of Nexeon; (2) Rosellini was the Chief Executive Officer of Nexeon; (3) Rosellini was the Chairman of the Board of Nexeon; and (4) Rosellini operated Nexeon and its affiliates for his own personal benefit and the benefit of his family to avoid personal liability for any obligations incurred in the course of business.

**K.    Count 11 – Disregard of Corporate Fiction.**

178.    Plaintiff will further show that Rosellini is jointly and severally liable for Nexeon's wrongful conduct because Rosellini used Nexeon as a sham to perpetrate, or cloak to conceal, fraud, wrongs and injustice.  Specifically, Plaintiff alleges that: (1) Rosellini was the largest

shareholder of Nexeon during the majority of the events that occurred as stated herein and, more recently, was the sole shareholder of Nexeon; (2) Rosellini was the Chief Executive Officer of Nexeon; (3) Rosellini was the Chairman of the Board of Nexeon; (4) Rosellini operated Nexeon and its affiliates for his own personal benefit and the benefit of his family to avoid personal liability for any obligations incurred in the course of business; and (5) Nexeon owns or owned minimal assets.

## L.      Count 12 – Disregard of Corporate Veil.

179.      Plaintiff further alleges that Rosellini is jointly and severally liable for the wrongful conduct of Nexeon because Rosellini intended to and did use Nexeon to perpetrate an actual fraud on Plaintiff.  This fraud on Plaintiff was perpetrated primarily for the personal benefit of Rosellini, who as the sole shareholder of Nexeon, was able to avoid paying Nexeon's debts.  Rosellini has continued to perpetrate this fraud on Blischak to avoid paying the Agreed Judgment.

## M      Count 13 – Attorney's Fees.

180.      Plaintiff was required to retain the services of the undersigned law firm in order to prepare and prosecute its claim.  Plaintiff has agreed to pay the undersigned law firm reasonable attorney's fees in connection with the trial and all necessary appeals.  Plaintiff seeks to recover his reasonable and necessary attorney's fees incurred and to be incurred in connection with any trials, hearings, and appeals of this or any other court pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code, Tex. Bus. & Com. Code 24.013, and any applicable contractual provisions at issue in this case.

## N.      Count 14 – Exemplary Damages.

181.      Defendant made false representations referenced throughout this Complaint with actual awareness of their falsity.  Defendant's conduct was wanton, in bad faith, and for the sole

purpose of obstructing and preventing Blischak from collecting the Agreed Judgment. Defendant engaged in his obstructive and fraudulent conduct for more than two years. As a result, Defendant is liable for exemplary damages to be determined by the trier of fact, including exemplary damages for malice and actual fraud under Texas Civil Practices & Remedies Code §41.003(a), and for violation of Texas Business & Commerce Code § 27.001 as a result of Defendant's actual awareness of the falsity of Defendant's representations or promises.

**O.     Count 15 – Injunctive Relief.**

182.     Pursuant to Tex. Bus. & Com. Code §240.008, Blischak seeks a temporary injunction prohibiting Rosellini and his affiliates from transferring, conveying or otherwise disposing of the MTI Stock.

**Jury Demand**

183.     Plaintiff requests a trial by jury.

**PRAYER**

Plaintiff Brian Blischak, individually and as assignee of Nexeon MedSystems, Inc., prays for the following relief against Defendant William Rosellini:

1. Economic damages in a sum within the jurisdictional limits of this Court;

2. Out of pocket damages

3. Actual damages

4. Benefit of the Bargain damages

5. Exemplary damages;

6. Pre-judgment interest;

7. Post-judgment interest;

8. Attorney's fees;

9.  Expert witness fees, costs for copies of depositions, and costs of court under Section 27.01 of the Texas Business & Commerce Code;

10. Injunctive relief;

11. Such other and further relief, at law or equity, to which Plaintiff may show himself justly entitled.

Respectfully submitted,

**SINGER & LEVICK, P.C.**


By:      /s/Todd A. Hoodenpyle
          Todd A. Hoodenpyle
          State Bar No. 00798265
          hoodenpyle@singerlevick.com
          16200 Addison Road, Suite 140
          Addison, Texas 75001
          Tel. (972) 380-5533
          Fax (972) 380-5748

**ATTORNEYS FOR PLAINTIFF**